# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| RICKEY L. JACKSON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Defendant. ) | Case No. 1:07CV00034 ERW |

**MEMORANDUM AND OPINION**

This matter comes before the Court on the Complaint of Plaintiff Rickey L. Jackson [doc. #3] for Return of Property. The first hearing in this Non-Jury Trial proceeding was held on January 26, 2009. After being advised that Mike Price, Assistant United states Attorney, had discovered potentially relevant evidence in a criminal prosecution file, the Court scheduled a second hearing before the Court which was conducted on July 24, 2009. Thereafter, the parties were permitted to file Post-Hearing Briefs which have been received and considered.

**I. BACKGROUND FACTS**

Plaintiff is incarcerated in the Bureau of Prisons serving a life sentence on a drug conviction. The Court entered a transportation order that Plaintiff be held in a local jail so he would be available for all court proceedings.

At the time of his arrest on the underlying drug charges, Plaintiff was driving a 1997 Ford Expedition, owned by the Ford Motor Company and leased to Cameka Tousant, mother of his children. The Expedition was removed from the arrest scene by law enforcement officers and eventually taken by police to the R and P Automotive parking lot for storage. Contained therein were items of personal property described by Plaintiff as fourteen CDs, paperwork comprising of "What=s

1

Stoppin Ya Records Company paperwork consisting of contracts (70 pages)" and a blue Fendi duffel bag. Plaintiff claims a possessory interest in these items. He maintains that these items were removed from the vehicle on June 3, 1998, and held by the police as evidence; that he is entitled to the immediate possession of these items or, alternatively, to be justly compensated if the items cannot be delivered to him.

The central dispute surrounds incidents that occurred at the R and P Automotive parking area on June 3, 1998, after police officers were notified by Mary Tousant, grandmother of Cameka Tousant, that Cameka wanted Mary to go to the R and P Automotive establishment, meet with police officers, and take possession of some personal property, before the Ford Motor Company came for the Expedition. Plaintiff asseverates, among other things, that his property was not delivered to Mary Tousant, that if it was, the officials had no authority to deliver his property to anyone but him; that songs on the CDs were valued at more than $30 million; that his CDs and paperwork had an estimated value of $129,950,000.00, and that a CD in the Government's possession has been damaged.

Undisputed facts include the presence of Mary Tousant, Vera Coburn, Raymond Brown, Carlos Kerley, Robert Lockett and Mark Greer at the R and P Automotive business on June 3, 1998. The Court is required to make significant credibility findings among witnesses. The Court recognizes that more than ten years separate the events of June 3, 1998, and the date of these two hearings, and that memories fade with passage of time. In some cases, confusion, because of passage of time, explains testimonial flaws.

After the first hearing, on January 26, 2009, as noted, Mr. Price located a CD, not previously known by him to exist, in the prosecution file, to be contrasted with the civil file which Mr. Price has been managing. Another Assistant United States Attorney tried Mr. Jackson's criminal case. The

Court will begin this analysis with Mr. Price's opening statement in the second hearing on July 24, 2009, to explain the discovery of a CD and its relevance to this case. The Court's references to that transcript is to "Trial Tr. Vol. II." Transcript references to the January 26, 2009 hearing are to "Trial Tr."

Mr. Mike Price, Assistant United States Attorney, explained that after this case was court tried on January 26, 2009, he and Eric Bohnet, attorney for Mr. Jackson on another of Mr. Jackson's cases, were conducting a mediation, and Mr. Jackson requested some documents from his criminal prosecution file. In the process of retrieving those documents, Mr. Price discovered a CD with no markings, unidentified "in any way either by a plastic cover or a, (sic) some type of writing or anything of that nature." Mr. Price had not been involved in the investigation of the criminal case. He found the CD in the bottom of a file box. He played the CD and said that the CD "sounded like Mr. Jackson, also had three tracks on it or three songs on it, and they were three songs that I recognize because the three songs on the compact disc were, the first song, "American Dream." He said the American Dream is number 15 on a CD "that has been important to me in the civil case. It was originally introduced I think as Government's 26 in the criminal case, and then we, we have used this a number of times and I would just say that it's my belief that the record would show that this particular CD has always been alleged to have been purchased by the agents at the time because it was in production in 1998." At the time of his statement, he was holding Government's Exhibit 26 from the criminal trial. Government's Exhibit 26 is not the one he found in the files. Mr. Price further explained that song number two on the recently discovered CD was a song titled "So Much Pain," number six on Government's Exhibit 26, and the third song on the recently discovered CD, number four on Government's Exhibit 26, is titled "You Can't Fade Me." Mr. Price said that the three songs he found on the disc matched three songs "that had been produced on this Gotti American

3

Dream CD, Government's Exhibit 26 . . ." Mr. Price said he believed he needed to consult with the agents because he had never seen the CD before. He examined the DEA logbook and saw that there was no indication that the CD had ever been logged in as evidence for the trial or as "non-drug evidence, you know, in Mr. Jackson's or Mr. Hume's file." He contacted DEA Agent Mark Greer, Officer Carlos Kerley and Officer Robert Lockett. Mr. Larry Gregory, DEA Agent, reported that the DEA CDs were a different color, and make, than the recently discovered CD. Mr. Price said that he then examined Mr. Jackson's motion for return of property and it occurred to him that he had always been concerned because Mr. Jackson had requested return of fourteen CDs and Mr. Price could only account for thirteen CDs.

The Number three request of Plaintiff was "What's Stoppin Ya Records, Master CD, gold in color, untitled, featuring recording artist Gotti,[1] concerning three songs, three hooks, three beats, with multiple musical instruments." Mr. Price said that he believes that the Government has now accounted for all of the CDs requested by Plaintiff. Mr. Price delivered the recently discovered CD to Mr. Jackson in open court at the July 24, 2009 hearing. It was marked Government's Exhibit P. The CD was then played by Plaintiff with supplied equipment. (Trial Tr. Vol II P.3 L.12-P.15 L.20).

The Court elects to begin consideration of proffered testimony with DEA Agent Mark Greer. He did not testify at the first hearing on January 26, 2009, because of an assignment out of the District. He testified that he continues to be a Special Agent with the Drug Enforcement Administration where he has worked since 1997. (Trial Tr. Vol II P.17 L.6-12). He was present when Mr. Jackson was arrested on May 22, 1998, when he seized a blue bag containing $7,000.00 in U.S. currency. (Trial Tr. Vol II P.19 L.13-P.20 L.8). Mr. Greer was present at a detention hearing held for Mr. Jackson before Judge Blanton on May 27, 1998, where Mr. Jackson's counsel

---

[1] Artist Gotti is a reference to Mr. Jackson.

introduced a cover from the case of a CD that Mr. Jackson was in the process of promoting or releasing. Mr. Greer identified Government's Exhibit O as the cover introduced before Judge Blanton. At the time of that hearing, Mr. Greer and other Drug Task Force officers had heard that Mr. Jackson had made and published a CD. Mr. Greer knew that when Mr. Jackson was arrested on May 22, 1998, there were CDs in the Expedition, but none were seized at that time. (Trial Tr. Vol II P.21 L.19-21; .22 L.25-P.23 L.8; L.15-P.24 L.14).

Mr. Greer was present on June 3, 1998, when Mary Tousant, Miss Coburn and Mr. Brown were at R and P Automotive in Caruthersville, Missouri, when Mary Tousant came to receive property from the Expedition. Mr. Greer identified Government's Exhibit G, as the form whereon June 3, 1998, he wrote "removed from vehicle for evidence." He testified that what he wrote was not a true statement. (Trial Tr. Vol II P.24 L.22-P.25 L.12; L.18-24). He testified that he and Officer Kerley completed parts of the form. He does not recall why the form was filled out in that nature. He testified that neither he nor any other officer seized any of the items listed on page one of Government's Exhibit G,[2] and that all of the items listed on Government's Exhibit G were delivered to Mary Tousant in the presence of Officer Lockett and Officer Kerley. Officer Greer testified that he witnessed Mary Tousant receive those items. He testified that Mary Tousant signed Government's Exhibit G. (Trial Tr. Vol II P.27 L.22-P.28 L.25).

Officer Greer testified that between June 3 and June 11,1998, the Ford Expedition remained at R and P Automotive before it was claimed by its owner, Ford Motor Company. Because of the interest in the investigation of the CD referenced at the detention hearing, between June 3 and June 11, 1998, Officer Kerley returned to the Expedition and was able to eject a CD from the CD player late in the evening. Mr. Greer testified that he took possession of that CD. On June 16, 1998, a

---

[2]Mr. Price explained that page one is the only page concerned with this case.

portion of that CD was played to the Grand Jury.  Mr. Greer testified that Officer Kerley brought the CD to the U.S. Attorney's Office and gave it to him.  Mr. Greer testified that he remembers sitting in the front office of the U.S. Attorney's Office, taking audio from the CD and putting the audio on tape.  Mr. Larry Ferrell, who tried the Jackson criminal case, wanted to present the audio portion to the Grand Jury.  (Trial Tr. Vol II P.30 L21-P.33 L.4).  Mr. Greer testified that he played the audio portion from Government's Exhibit P to the Grand Jury.  (Trial Tr. Vol II P.33 L.23-P.34 L.3).  He believes Government's Exhibit P was placed back in the U.S. Attorney's file.  Mr. Greer never saw the "gold in color" CD thereafter until he saw it in Mr. Price's office on July 24, 2009, before the second hearing.  (Trial Tr. Vol II P.34 L.13-25).

 Mr. Greer stated that he testified in Mr. Jackson's criminal trial.  He recognized Government's Exhibit 26 which bears the title "Gotti American Dream."  Mr. Greer testified that sometime in June 1998, after Mr. Jackson was indicted and after the detention hearing, he made the purchase in Dyersburg, Tennessee of Government's Exhibit 26.  He transcribed all of the songs on Government's Exhibit 26 for the criminal court hearing.  He has also listened to Government's Exhibit P "today." Government's Exhibit P starts with "American Dream," number 15 on Government's Exhibit 26, "So Much Pain" is next, number 6 on Government's Exhibit 26 and "You Can't Fade Me" is next, number 4 on Government's Exhibit 26.  (Trial Tr. Vol II P.37 L.16-P.39 L.11).  He testified that of all fourteen CDs, only Government's Exhibit P did "not have a name on it or identified in any way." (Trial Tr. Vol II P.40 L.4).

 The Court will next consider the testimony of Mr. Jackson introduced at the first hearing on January 26, 2009.  Plaintiff was duly sworn and was permitted to offer testimony in narrative format.  He testified that he was arrested in Hayti, Missouri, on May 22, 1998, while driving a 1997 Ford Expedition which contained items of personal property that were seized and never returned to him.

(Trial Tr. P.141 L.13-15; P.142 L.11-9). Mr. Jackson refers to pages 2, 8, 12 and 13 of Plaintiff's Exhibit 5, a 23-page document as he began to testify. (Trial Tr. P.142 L.14-P.143 L.9). Mr. Jackson testified that he and his lawyers tried to suppress from the use of evidence to be used against him, "[a]n American Dream CD seized from the 1997 Ford Expedition." (Trial Tr. P.144 L.14-17). He testified that he saw the CD present in court. He said it was not the CD purchased by Officer Lockett, "[t]hat CD was not even in, available until July 7, 1998." (Trial Tr. P.145 L.15-24). Mr. Jackson testified that there were actually two CDs, one was American Dream and the other was An American Dream. He refers to Judge Blanton's decision from Plaintiff's Exhibit 5, and testified, "[s]o in his denial the following, it states that An American Dream CD was listed by the Government. It also states that a CD, at the hearing, it also came up at the hearing that a CD titled An American Dream was also removed from the vehicle." (Trial Tr. P.146 L.1-14.). He testified that there were two CDs that were removed from the vehicle. He refers to page two of Plaintiff's Exhibit 5 which states in the Government's response, the Government "listed one large white bag including one blue bag and one American Dream CD." (Trial Tr. P.146 L.15-25).[3]

---

[3]The Court has examined the Report and Recommendation of Judge Blanton, Plaintiff's Exhibit 5. On page 2, Judge Blanton states,

> With respect to items seized from the 1997 Ford Expedition, in Government's Response to Defendant's Motion to Suppress Evidence, the government listed: (1) one large white bag and contents, including one blue bag with approximately $7,000.00 in United States currency; and (2) one "American Dream" CD. The government urged that the items were seized both pursuant to a consent to search and pursuant to a valid inventory of the motor vehicle.

On page 8, Judge Blanton states in his order:

> Sergeant Heath testified . . . that a large quantity of United States currency was located in a blue bag which, in turn, was inside a white bag in the vehicle. Additionally, a CD entitled An American Dream was found. Sergeant Heath testified that according to inventory policy, an officer is required to inventory all items found in a vehicle, including contents of any containers.

Mr. Jackson testified that CDs were recorded by him over the years with different artists, outlined in his paperwork, which tracks the recording of these CDs. It lists various artists along with Plaintiff. It lists what label they were recorded for, which was [W]hat's [S]toppin [Y]a, which was a label that I own. It lists the year that these songs were recorded. And it also lists which CDs were master CDs." (Trial Tr. P.148 L.17-P.149 L.9). Mr. Jackson testified that a master CD is a CD that is ready to be produced. He explained how Government's Exhibit N[4] referenced a CD that had been duplicated, and that the problem with a master CD is that it has never been duplicated. (Trial Tr. P.149 L.10-25). He testified that he was in the process of moving in May, 1998, and the CDs and paperwork were in the Ford Expedition. He said that on that Friday, he was supposed to go to Texas to meet with a record company, "a record executive for Tower Records. That is how all of that property ended up in the truck which was removed for evidence." (Trial Tr. P.150 L.1-8). He testified that the Government never notified him or his attorneys "about this evidence that was removed from the vehicle." (Trial Tr. P.150 L.9-15).

> On page 12 and 13, Judge Blanton notes,
>
> Carlos Kerley, an agent with the Bootheel Drug Task Force, testified that he obtained a CD entitled "American Dream" from the 1997 Expedition. He testified that it was a blank CD with the song titled "American Dream." He retrieved that from the vehicle because throughout the investigation it had come to his attention that the CD contained lyrics about drug trafficking and gangster activity. He stated that he had been present at the detention hearing of the defendant and was aware of the testimony presented during that hearing concerning the numerous songs on the CD. He obtained that CD a couple of days after the detention hearing, the week following the week in which the defendant was arrested. The vehicle was still impounded at that time.
>
> On cross-examination, Agent Kerley testified that he did not find any guns in the vehicle. He testified that there were a number of CD's in the vehicle, but the American Dream was the only CD which he seized.

[4]Government's Exhibit N is described as the Gotti American Dream CD produced by Mr. Jackson. This is the CD describing drug activity that was used against Mr. Jackson in his criminal trial.

Mr. Jackson testified that he believes that if Mary Tousant had received the property, she would have told him. (Trial Tr. P.152 L.21-P.153 L.1). Mr. Jackson testified, "[t]his was my property. It wasn't no one supposed to get my property but me. I never gave permission for them to give my property to nobody. I never signed a consent form for them to give my property to anyone." (Trial Tr. P.153 L.5-8). He testified that he stated in Plaintiff's Exhibit 30, there are years of recording in different studios by him collecting various artists to be on records with him. He testified that the paperwork that the Government removed from the vehicle for evidence will show that he made a legitimate income and that he had a studio. He admitted that he did not file income tax returns. He said that the paperwork which the Government had never came back to him; that it included contracts signed by him in his name and that he was on the CDs.

Mr. Jackson offered Plaintiff's Exhibit 19, a photograph of the interior of the Ford Expedition, which shows a black Fendi Bag which he says the Government never mentioned. (Trial Tr. P. 157 L.15-P.158 L.1).

During cross-examination, Mr. Jackson testified that the Gotti American Dream CD, Government's Exhibit N, was produced by him. He said it is different than American Dream and An American Dream. The American Dream CD had three songs, the one of which a tape was made and was played to the Grand Jury. (Trial Tr. P.161 L.20-P.163 L.4). He said that the CD, An American Dream, has other artists on it, other than him. He said that he produced that CD also. He admits that it is not listed on any Government exhibit, but it came up in the suppression hearing. He was asked if Exhibit N was the only one used at the [criminal] trial, and he testified, "[y]es. That's the only one that was related to a drug thing." (Trial Tr. P.163 L.5-18). Mr. Greer's testimony is consistent with Plaintiff's testimony concerning the audio that was played before the Grand Jury.

9

Mr. Jackson testified that the Government led him to believe that all of his valuable CDs were stolen in a break-in of the Ford Expedition, however, he admitted that the break-in of the Ford Expedition occurred on June 10, 1998, a week after the June 3, 1998 occasion when the Government alleges that Mary Tousant took possession of his property. (Trial Tr. P.163 L.19-P.164 L.20).

Mr. Jackson admitted that the Ford Expedition was listed in the name of Cameka Tousant because he did not think that he could get approved to execute the lease. (Trial Tr. P.165 L.12-24). Even after Mr. Jackson's criminal conviction, he still, on cross-examination, denied receiving money from drug transactions. (Trial Tr. P.166 L.3-10). The Court concludes that Mr. Jackson has fashioned exhibits and his testimony in an effort to continue, in some fashion, to challenge his criminal conviction. During his testimony, it became obvious that his purpose in bringing this action is to demonstrate that he was not involved in drug trafficking or money laundering.

He testified:

Why provide plaintiff or his attorneys the paperwork from What's Stoppin You Records which would show a legitimate income from '92 to '98.

(Trial Tr. P.16 L.10-12).

MR. JACKSON: As I stated in P30, are years and years of recording, recording at different studios by me collecting various artists to be on these records with me. The paperwork that the Government seized, that the Government removed from the vehicle for evidence, will show that I made a legitimate income. I had a studio.

THE COURT: Did you file income tax returns?

MR. JACKSON: No, I didn't.
THE COURT: Okay.

(Trial Tr. P.153 L.9-18).

Now, the Government attempts to lay claim through its witnesses that the CD really wasn't that valuable. Going and getting the CD out of the truck wasn't that valuable, that's why we never listened to the rest of them, it wasn't that valuable. But, I was present at the trial. I was the criminal defendant. The CD, the music played an important part, a big part, a very big part. And the CDs, I can understand the Government not wanting to introduce those CDs because those CDs would

10

contradict the fact that my only income was drug trafficking. Because those CDs that the Government did not listen to, did not remove for evidence, they wasn't on the drug trafficking --

(Trial Tr. P.159 L.3-16)

Mr. Jackson testified that the CDs that he claims were in the vehicle were "marked with names on 'em," and were made through "Pen and Pixel." (Trial Tr. P.167 L.15-25). He testified that the CDs had his Company's logo on them, "What's Stoppin Ya Records and it has a couple of pistols." (Trial Tr. P.168 L.3-11). He was asked, "[s]o it's identical, if we had a master that had been produced and we went to the store and we bought another one, they'd look exactly alike." He answered, "[r]ight." (Trial Tr. P.168 L.24-P.169 L.2).

Mr. Jackson testified that his Company was incorporated in the State of Missouri in 1996 or 1997, but when challenged that a record search revealed no such recording with the Secretary of State he responded, "I mean me and Mom, she tried to get it, too. I have no explanation. I had a business license in Sikeston, Missouri." (Trial Tr. P.169 L.16-P.170 L.5).

In his motion for return of property, Mr. Jackson claimed there were more than 200 songs written by him, but he admitted that none were submitted for copyright protection. He admitted that the only CD that he ever put out was Gotti American Dream, and none others were ever released. (Trial Tr. P.170 L.5-22). He admitted that he appeared on the CD as "Baby Gotti," fashioned after the infamous mobster. (Trial Tr. P.172 L.18-24). He testified that the American Dream CD was recorded "in various places, with two songs recorded at South Studio, which is my studio." He testified that he did not own the physical premises that the studio was on; that his recording equipment was in a house in Sikeston and a house in Columbia. He called it a home studio. He said the equipment was something that could be placed in the back of a car, "[t]he majority of them is probably the size of a computer, like the mixing board, which I had a digital mixing board, so it was a little bit bigger than that. You have the amps, you have the speakers, the computer, the beat

11

machine, all the wires." He acknowledged it was portable, something that could be moved around so if he wanted to go to a club and record something he could do that. (Trial Tr. P.172 L.25-P.175 L.1).

Mr. Jackson testified that Cameka Tousant and he were involved in a romantic relationship. They had children together and lived together from time to time. She appeared on the CD. (Trial Tr. P.175 L.2-5;14-21). He was asked if after he was arrested he asked Cameka and his Mom to try to get the vehicle back. He responded, "[n]o. I asked my mom to go and get the CDs and that paperwork back. My Mom couldn't get the vehicle there." He was asked, "[y]ou don't recall asking Cameka and your mother to do that?" He answered, "[n]o. I probably asked Cameka to get it back. This is consistent with grant of authority claimed by Mary Tousant to retrieve the property. I can't see why I'd ask my Mom to get it. She couldn't get it." (Trial Tr. P.175 L.22-P.176 L.6).

Mr. Jackson was asked about financial arrangements he had with rap artists that he had recruited. He said they had worked out a different type of payment scale. "If I could get you to come in for $500 and you do it, you do it. You know? But ours, I got some documents to show you, some drafts that I made which was for the company and it shows . . . ." (Trial Tr. P.178 L.4-16). He projected in his Exhibits 30-37 that total sales from CD sales that he intended to receive would be $2.3 million. He further broke-down the expenses and anticipated revenue. He admitted that he had actually not sold anything to Tower Records, but "[w]e was working on a deal at the time I got arrested." (Trial Tr. P.178 L.17-P.181 L.7).

Mr. Jackson was questioned about the artists he claimed would appear on his CDs. One was Lil Creep, an "artist out of Mexico," and another was Jonny P. He testified that he had paid them nothing, "because it was all stipulated upon a deal that I had in place." Tupac was another artist he claims would be on his CDs. When asked how much Mr. Jackson paid him, he testified, "[h]ow much

12

Tupac? Tupac got - - I mean, he did a couple of songs. He was a package deal, so he did songs - - songs I did with him was in '93, before he was actually really famous. So, I mean, I would imagine he probably received six, seven grand per song. I mean, it's been awhile but I mean." When asked how much he paid Master P, a well-known performer, he testified that he came through another person. "I have his receipts - - somebody sold me Master P. Master P reneged on the deal, whatever, something happened, they had a falling out, dude wanted to get rid of his lyrics so I ended up buying 'em." He said he paid a guy named "Slim" in New Orleans. (Trial Tr. P.182 L.5-183 L.17;184 L.12). Mr. Jackson testified, "I got the receipt for that. Or maybe not." When asked about the artist Scarface, he first said "[t]hat was the name of a group, Scarface." He then said, "that was, that was really the name of the album." He was asked why the albums were named after famous performers. He answered, "[b]ecause the reason they're named after them because, like I said, at the time when I got, when I went to get them mastered, I didn't have the titles. The titles wasn't on 'em. So what I did was put the money artists. These are the money artists on there." (Trial Tr. P.185 L21-P.186 L.3).

Mr. Jackson is not a believable witness. At first, he testifies that he paid artists $500, then nothing, "because it was all stipulated upon a deal that I had in place." (Trial Tr. P.183 L.5-7). He claims that he can use the names of famous artists on albums, that he paid for songs of famous artists and has proof, "[o]r maybe not" and that Scarface is the name of a group, then, "[n]o, that's the name of - - that was, that was really the name of the album. The album was going to be Scarface." When asked to explain his Exhibit 30 he testified, "[o]kay. This is, this is a master. This is not really - - before, before the master - - before it's mastered, there are songs that are not mastered, like for instance p. 43." (Trial Tr. P.188 L.10-17). He testified that he got the recording budget form upon which he wrote in information from an unidentified person in New York. He was asked if he filled

13

in the information as he went along or filled in all of the information at a later date. He answered, "[n]o, they all was filled in on different times." Next, he was asked, "where were these records kept if they weren't with all the valuable contracts in your bag?" He answered, "[t]hese were never going. These records here was never going." In answer to a question of where the records were kept, he said, "[a]ll these was with my grandma." (Trial Tr. P. 188 L.18-P.189 L.12). Mr. Jackson does not know how much he made from the one CD he produced, he said, "I was locked up. I have no idea." (Trial Tr. P.193 L.19-20). He fails to show that he received anything for that CD.

Cross-examination, once again, changes fantasy into reality. On redirect, Mr. Jackson testified that he paid $25,000.00 to Master J in New York "for the mixing." Next, he testified that he paid $65,000.00 for ten songs from Master P, Silk and C-Murder. (Trial Tr. P.227 L.8-P.228 L.18). On re-cross examination, Mr. Jackson testified that he paid the $25,000.00 amount in cash to JMJ Enterprises. When asked if he got a receipt, Mr. Jackson answered, "Um - - yeah, I'm pretty sure I did." (Trial Tr. P.229 L.13-P.230 L.4). Concerning the $65,000.00, Mr. Jackson testified that he did not pay that sum in cash but "we did some barter. I paid I believe, I believe like 35 to – $35,000 or something. And then I, I - - we bartered some beats. That means that he - - I made some beats, he liked the beats, so I gave him the beats. . . ." (Trial Tr. P.230 L.18-23). Mr. Jackson has no receipt for the $35,000.00 sum. He asks the Court to order his property returned that he claims is worth $30 Million. (Trial Tr. P. 195 L.2-5). Mr. Jackson fails in his burden of proof. The Court is persuaded that the papers he claims are missing, if they even existed, were never in the Expedition during the time the Expedition was in police custody.

Mary Tousant, grandmother of Cameka Tousant, was called as a Government witness. She considers Mr. Jackson as kind of a son. (Trial Tr. P.196 L.22-P.197 L19). She, Vera Coburn, her sister, and Raymond Brown, now deceased, went to R and P Automotive on June 3, 1998. When

14

asked if she went there to discuss some property, she responded, "I was supposed to get some property or something from them but I never did get it." (Trial Tr. P.198 L.8-P.199 L.2). She testified that when she got "there" she signed some papers. She was shown Government's Exhibit G, a four-page document. She acknowledged that the document was dated June 3, 1998. She acknowledged her signature appearing on page one, over the signature of Officer Lockett, a person she earlier acknowledged as knowing. She testified that she saw him sign the form and that he witnessed her signature. (Trial Tr. P.199 L.23-P.200 L.11; 23-P.201 L.2;9-24). She also acknowledged that page two of Government's Exhibit G bore her signature, that she signed pages three and four, also; she did not deny signing any of the pages and she testified that she read the forms before she signed them. She testified that no one forced her to sign the forms and no promises were made to her to get her to sign the forms. (Trial Tr. P.201 L.25-P.203 L12). She remembers calling law enforcement officers to find our where the property was located. (Trial Tr. P.203 L.13-18). She acknowledged that she heard officers testify that she had called to find out where to pick up the property, and she was told to go to R and P Automotive. She testified that she went there representing her granddaughter, Cameka Tousant, the person Mr. Jackson admitted as the same person he probably authorized to retrieve property. (Trial Tr. P.203 L.19-P.204 L.9).

On cross-examination, Mary Tousant testified that she did not receive the CDs and paperwork. She testified that she never gave them to anyone because she did not have them to give. She believes that she did get a copy of Government's Exhibit G, but she does not know where it is. (Trial Tr. P.205 L.4-10;P.207 L.8-22).

On redirect examination, she testified that she remembers talking to Assistant United States Attorney, Michael Price, in his office with other officers and telling him on October 23, 2008, that she did not remember getting any of the property. (Trial Tr. P.209 L.13-P.210 L.5). She recalls

15

calling the police station to get the property and went "down there" on June 3, 1998, that she signed the forms acknowledging that the property was turned over to her, but she testified, "I see that but I didn't get it." (Trial Tr. P.211 L.14-P.212 L.12). She testified that she had driven a long way to get the property, that she did not get it and she complained to no one because she did not get it. (Trial Tr. P.216 L.11-25). The Court is persuaded that the property listed on Government's Exhibit G was delivered to Mary Tousant.

The Government next called Vera Coburn, sister of Mary Tousant. She served as a reference for her niece, Cameka Tousant, to lease the 1997 Ford Expedition. (Trial Tr. P.217 L.8-P.218 L.3). She testified that she went to R and P Automotive on June 3, 1998, with her sister and Raymond Brown. She saw Mary Tousant sign the forms. Mary Tousant told her that Officer Lockett was "going to give [her] the stuff that they took out of the van." She testified that neither she, Mary Tousant nor Raymond Brown received the property and that she left and did not complain to anyone. (Trial Tr. P.218 L.22-220 L.9).

Carlos Kerley has been a detective with the Springfield, Missouri Police Department for eight years. He was involved with the arrest of Plaintiff, in the underlying drug prosecution, on May 22, 1998, and seized some of Plaintiff=s property at the jail. (Trial Tr. P.24 L.3-6, P.26 L.5-25). Officer Kerley also "retrieve[d]" "some clothing, some CDs, and personal, personal items with the clothing" from the Ford Expedition on June 3, 1998. He testified that he inventoried the property and Special Agent Mark Greer transferred custody of that property to Mary Tousant. (Trial Tr. P.28 L.18-P.29 L.2). Officer Kerley identified his handwriting as being on Government's Exhibit G, the itemized list of the inventoried property. (Trial Tr. P. 30 L.19- P.31 L.9). He testified that Agent Greer wrote on Government's Exhibit G, "return property to owner Mary [Tousant] (spelled Pousant)." (Trial Tr. P.32 L.8-10) (Gov=t. Ex. G). Officer Kerley testified that the Ford Expedition was re-searched

16

because Mary Tousant "called and wanted that property.@ (Trial Tr. P.34 L.13-16). Officer Kerley was asked by Mr. Jackson on cross-examination if he looked at the paperwork. He testified that he did look at it, then said, "I don't remember. It swas nothing that had anything to do with my investigation. it was personal paperwork. It had nothing to do with my investigation." When asked by Mr. Jackson if it was personal paperwork, Officer Kerley testified, "[p]ersonal paperwork of yours or Cameka Tousant's or maybe something to do with your kids, I don't remember." (Trial Tr. P.53 L.19-P.54 L.4). The Court declines to consider the balance of Officer Kerley's testimony because such testimony is not required by the Court to make its findings based on all of the credible evidence in the case.

Mr. Robert Lockett testified as a Lieutenant with the Charleston, Missouri Police Department. He was present when he and other officers went to the Ford Expedition for the purpose of giving "things that were in the vehicle to Mary Tousant." (Trial Tr. P.89 L.8-P.90 L.5). Officer Lockett personally assisted Officer Greer remove the items on Government's Exhibit G from the Expedition and witnessed the inventory of the items. He personally witnessed the hand delivery of the items to Mary Tousant. He saw her receive them and saw her sign her signature in receipt of the items. He testified that he is familiar with some of the artists on the CDs found in the Expedition on June 3, 1998. He answered "yes" to the question, "[d]id you recognize any CD on Government's Exhibit G that, that you could buy across the counter at a place like Wal-Mart?" (Trial Tr. P.111 L.6-14).

Larry Gregory is a special agent with the Drug Enforcement Administration ("DEA"). He is the non-drug evidence custodian for that agency. (Trial Tr. P.116 L.13-23). He testified, in answering a question of Mr. Jackson, that he believed Government's Exhibit G containing language, "[r]emoved From vehicle for Evidence" was mislabeled. He testified, [i]f this was removed from the

17

vehicle for evidence, there would have been no reason for Ms. Tousant's name to be at the bottom of this form as her having received the property." (Trial Tr. P.122 L.5-12). He testified that Special Agent Mark Greer was the lead agent in charge of the Rickey Jackson criminal case, and he would have delivered any evidence he seized to Agent Gregory's office. (Trial Tr. P.135 L.18-25). He examined the entire file. "[T]hose CD's, the miscellaneous paperwork and the clothing, the items that was *sic* removed from that vehicle on that specific day, those items were never released to me as evidence." When asked that since they were never seized nor forfeited no notice was required, Agent Gregory answered "[y]es sir. That's correct." (Trial Tr. P.137 L.15-P.138 L.6). He testified, "[t]hose items were never seized." (Trial Tr. P.138 L.7-9).

## II ANALYSIS

Mr. Jackson brings this action for return of property under Fed. R. Crim. P. 41(g). Mr. Jackson has the burden of proof to show by the greater weight of the evidence or by the preponderance of the evidence that property he claims to have owned, actually existed, and that if it existed, he is lawfully entitled to the property. *See United States v. Manelli,* 667 F.2d 695, 698-99 (8th Cir. 1981).

Mr. Jackson claims to be the owner of fourteen CDs and a duffel bag. During neither of the two hearings did Mr. Jackson prove either that he owned such a bag, that any such bag had any value or that it was in the possession of the United States. The Court finds that any claim for the duffel bag will be denied. Likewise, his claim for return of thirteen CDs, and in the alternative for $129,950,000.00 for the value of the property not returned to him, will be denied. The only relief to which Mr. Jackson is entitled is the return of the gold in color untitled CD found by Mr. Price in the prosecution file described as Government's Exhibit P. It will be ordered that possession of that CD be delivered to Mr. Jackson. The Court finds its value to be $1.00.

The Court held two evidentiary hearings in this case. *See United States v. Timley,* 443 F.3d 615, 625 (8th Cir. 2006) (where there is a fact dispute regarding who has custody or is entitled to possession of the subject property, the court must hold an evidentiary hearing to determine those issues)). Mr. Jackson is a bright man with a heightened imagination and a mission in trying to set aside his criminal conviction for which he is serving a life sentence. The Court finds that the CDs which he claimed were extraordinarily valuable recording CDs to be used by him to enhance his recording career were CDs that could be purchased at retail stores, and that they had no value beyond the ordinary purchase price of approximately $20.00 each. If Mr. Jackson ever possessed the type of CDs he now claims he once owned, the Court finds that they were not in the Ford Expedition on June 3, 1998, when the inventory of the personal property was made. Furthermore, the Court finds that the " miscellaneous paperwork" claimed by Mr. Jackson as being contracts and valuable recording materials, were, likewise, not in the Ford Expedition when the inventory of personal property was made on June 3, 1998. Rather, the papers in the Expedition on that date had no monetary value.

In any event, thirteen of the fourteen CDs and the miscellaneous papers were delivered to Mary Tousant on June 3, 1998. She had the right to receive those items of personal property. The Ford Motor Company was about to take possession of the Ford Expedition, as its owner, and Cameka Tousant had the right, as lessee, to have possession of the items in the Expedition before the Expedition was removed by the Ford Motor Company. Cameka Tousant asked her Grandmother to go to R and P Automotive and remove the personal property from the Expedition. Mary Tousant made arrangements to meet the police officers at the location of the Expedition to receive that personal property. Mary Tousant went there, she met the officers, and the items Mr. Jackson now seeks to be returned to him were delivered by police officials to Mary Tousant. As observed in another of Mr. Jackson's suits, *Jackson v. United States,* 526 F.3d 394, 397 (8th Cir. 2008), "evidence is sufficient

too prove that Tousant, acting through her grandmother, asserted a claim of ownership adverse to that of Jackson."

Mary Tousant had authority to receive the items of personal property from the officers on June 3, 1998, and she received the items. No agent of the United States has any of Mr. Jackson's property of any description, except the gold in color CD identified as Government's Exhibit P which will be ordered returned to Mr. Jackson.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the gold in color CD found by Mr. Price in the prosecution file identified as Government's Exhibit P be returned to Mr. Jackson within ten (10) days of this date;

**IT IS FURTHER ORDERED** that all other claims of Mr. Jackson under Fed. R. Crim. P. 41(g), are dismissed with prejudice;

**IT IS FURTHER ORDERED** that Motion to Determine if Agent Greer Testified Falsely Under Oath [doc. #114], Motion to Investigate Fraud [doc. #119], Motion to Investigate Fraud [doc. #120], and Motion for Ruling [doc. #123] are **DENIED**, as moot.

So Ordered this 20th Day of November, 2009.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE